# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Alonzo Jerome Graham,

      Petitioner,

v.

Jessica Symmes, Warden,

      Respondent.

Civ. No. 10-2404 (JNE/JJK)

**REPORT AND
RECOMMENDATION**

---

Paul J. Maravigli, Hennepin County Public Defender, counsel for Petitioner.

Linda M. Freyer, Assistant Hennepin County Attorney; Matthew Frank, Assistant Minnesota Attorney General, counsel for Respondent.

---

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before the Court on the Petitioner's Petition Under 28 USC § 2254 for Writ of Habeas Corpus by a Person in State Custody. (Doc. No. 1.) Respondent has responded to the Petition requesting its denial. (Doc. No. 10.) The matter has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, this Court recommends that the Petitioner's Habeas Corpus Petition be denied, and this action be dismissed with prejudice.

## BACKGROUND

In May 2007, Petitioner was convicted after a jury trial in Hennepin County

District Court, of one count of first-degree murder while committing or attempting to commit first-degree aggravated robbery, and six counts of attempted first-degree aggravated robbery, relating to an incident in South Minneapolis on June 24, 2006.  He was sentenced to life in prison for the first-degree murder conviction, with consecutive 60-month sentences for the attempted robbery convictions.  Petitioner appealed his conviction to the Minnesota Supreme Court. On April 23, 2009, in an 8-0 decision, the Minnesota Supreme Court affirmed the convictions.  *State v. Graham*, 764 N.W.2d 340 (Minn. 2009).  The judgment of conviction was entered on June 18, 2009.  Petitioner now brings this Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

Petitioner was accused of killing a man named Paris Fulcron, who was arranging a marijuana purchase at a South Minneapolis home when Petitioner and an accomplice pushed their way into the home to commit a robbery.  At the time, there were five residents in the house.  The evidence presented at trial indicated that a fight broke out in the house between Petitioner and Fulcron and that Petitioner shot and killed Fulcron.  After the police arrived at the scene, they found Petitioner's car backed up into an alley driveway two houses down with the car door open and the keys in the ignition.  They also found a cell phone in the car that had a telephone number traceable to the accomplice.

At trial, the State called each resident of the home to provide eyewitness testimony that Petitioner committed the crime.  The State also presented

evidence that the fingerprints obtained from the car belonged to Petitioner, that the DNA evidence obtained from the phones did not exclude Petitioner, and that the clothing found when Petitioner was arrested matched the witnesses' descriptions of the clothing worn by the assailant who shot and killed Fulcron.

Petitioner defended the case by arguing that this was a case of mistaken identity, and therefore the State could not prove that Petitioner was the assailant. The defense attempted impeachment of the eyewitnesses, focusing on inconsistencies between the witnesses' testimony at trial and their prior statements, contradictions between the witnesses' recollections about the shooter's clothing, hair style, and the sequence of events, and their inability to clearly observe what was happening.  In the end, the jury found Petitioner guilty of first-degree murder.

Petitioner's habeas action is based on evidence regarding Petitioner's alibi, which was never before the trial jury.   Nine months after Petitioner was charged with the crime and a few months before trial, two alibi witnesses came forward – Petitioner's former girlfriend and the former girlfriend's mother.  In late March 2007, the girlfriend gave a statement to an investigator that Petitioner had been at her home at the time of the crime, and her mother provided a corroborating statement that she had seen Petitioner at the home.  The defense counsel submitted these statements to the prosecution.  On April 3, 2007, the prosecutor informed the district court that the State was concerned that the alibi testimony

was false.  The prosecutor explained to the court that the concern about the

falsity of the testimony arose from the following circumstances:

- Prior to his original trial date in November 2006, Petitioner asserted self-defense and indicated he had no witnesses.  The day before trial was scheduled to begin Petitioner entered guilty pleas to murder and attempted robbery.  On the date set for the sentencing hearing in December 2006, Petitioner withdrew his guilty pleas.  A new trial date was set for April 2007.  (Tr. 18–19, 57–58.)

- Petitioner filed a second self-defense notice in early March 2007. (Tr. 18.)  Two weeks after sending the prosecutor the second self-defense notice, Petitioner sent the prosecutor an alibi-defense notice and witness list setting forth the names of Niaayhia Smith, the girlfriend, and Tonya Harden, her mother.  (Tr. 18–19.)  The alibi-witness statements were then supplied to the prosecutor on March 27, 2007. (Tr. 24.)  The alibi notice was sent nine months after the June 2006 murder.  (Tr. 19.)

- At the time of the June 2006 murder, Ms. Smith was seventeen years old and Petitioner was on probation for terroristic threats against Ms. Smith.  Petitioner had pled guilty to the offense of terroristic threats in February 2006.  As a result of that plea, a "no contact" order precluded Petitioner from having any contact with Ms. Smith.  (Tr. 22.)

- While the terroristic-threats case was pending, Petitioner sent Ms. Smith a letter from jail instructing her as to what she needed to do "to get him out of" the charge and help him avoid a conviction for terroristic threats.  (Tr. 38.)

- Petitioner's co-defendant in the murder case, Durrell Bobo, pled guilty and submitted a sworn factual basis implicating Petitioner as the shooter in the June 2006 murder.  (Tr. 67.)

The prosecutor requested that these witnesses have "conflict attorneys"

appointed to represent them:

And Your Honor, I'm requesting that these people be appointed conflict attorneys because if the statement that they've already provided prove to be false, they could both be charged with aiding

an offender, and the sentence that crime would carry is half of what the defendant is looking at, which is 15 years plus half of multiple counts of attempted agg robbery. So, if they are charged with that crime – and I'm sure no one has bothered to tell them that, and certainly no independent counsel, that they could be looking at some very lengthy sentences.

(Tr. 22–23.) The prosecutor said she wanted "to make it clear that this isn't a threat," but that "[a]s an officer of the Court" she was "informing the Court that it is my view that there is a potential" for a charge of aiding an offender in violation of Minn. Stat. § 609.495 if the alibi witnesses' statements proved false. (Tr. 41–42.) The prosecutor observed that both "giving false statements to try to exonerate [Petitioner] knowing that these statements are false" and then "getting up under oath and giving those statements knowing that they're false" were acts constituting the offense of aiding an offender. (Tr. 62.) In addition, the prosecutor told the court that the girlfriend and her mother could be charged with perjury as well as aiding an offender if they testified falsely. (Tr. 41–42.)

Petitioner's defense counsel objected to the court stating that the prosecutor was making threats that were "interfering with [Petitioner's] due process rights and the right to raise a legitimate defense." (Tr. 41.) She asserted that the alibi witnesses were the only people who could show where Petitioner actually was at the time of the killing.

The trial court decided that the witnesses should have the opportunity "to consult with an attorney if they feel the need to," and made the following conclusions:

5

> The State has, I think, made an adequate record here as to the
> possibility of their testimony leading to charges against each under
> Minnesota Statute 609.495, subd. 3, Aiding an Offender, which, if
> such charges were brought and if a conviction was gained, could
> lead to a sentence of not more than one-half of the maximum
> sentence imposed upon the Defendant in one or any of the charges
> in this matter.
>
> The State has raised the issue as well that the possibility – of the
> possibility that these two potential witnesses should at least have the
> Court decide whether they should be advised in some way and
> provided with an opportunity to consult with counsel.

(Tr. 150–51.)

When the witnesses appeared in court in response to the defense subpoena, the trial court informed them that "there may be issues of charges or issues of constitutional rights that you have that should be addressed" and therefore an attorney was "available if you wished an attorney be appointed for you or have time to talk to an attorney."  (Tr. 301–02.)  An attorney was then appointed to advise the alibi witnesses.  The witnesses never spoke to the prosecutor or anyone from the prosecutor's office and only spoke with the court on the record when being assisted by the appointed counsel.  The prosecutor did, however, communicate with the witnesses' counsel, telling him that the witnesses had already subjected themselves to possible prosecution under Minnesota law of aiding an offender by giving a false statement and "that that would be even worse if they got up under oath."  (Tr. 1486–88.)  After meeting with the independent counsel, each witness decided to invoke her Fifth Amendment privilege and thus not testify.

The witnesses' appointed counsel told the court:

> Your Honor, I had an opportunity to talk to Ms. Smith and
> Ms. Harden individually.  I explain [sic] to them their rights.  I
> explained to them – I talked to them about the statement that was
> given to an investigator.  After discussing it with both of them
> individually, I told them they had a choice to say I don't want you as
> a lawyer and come in here and testify, or they had a choice to say I
> want a lawyer and I don't want to testify.  They can confirm for you
> that, and they both independently have asked me to tell you that
> they do not want to testify and that would be an invocation of the
> Fifth Amendment, Your Honor.

(Tr. 303.)  The court confirmed with each witness that she wanted to exercise her

Fifth Amendment right not to testify.  (Tr. 303–04.)  The court then upheld the

invocation of the Fifth Amendment privilege and released the witnesses from

subpoena:

> I'm not sure exactly, as I said, what were in those statements.  What
> I know, and I will make a record here, that I've been aware of those
> issues for a few weeks now as to possible repercussions here
> regarding testimony if it was made during this trial under oath.  And
> these are based on representations made by the State.  You weren't
> present, but they're the same representations that Mr. Martinez has
> told you.  And based on those as to possible or probable charges
> and the likelihood that your testimony under oath would expose you
> to certain prosecution or penalties, I will quash those subpoenas,
> release you from the obligation to testify, and of course base that on
> the rights that you have against self incrimination under the
> Constitution of the United States and the State of Minnesota.

(Tr. 304–05.)  The counsel for the witnesses declined the request of Petitioner's

counsel that he place on the record how the two witnesses would incriminate

themselves should they testify at trial.  Petitioner's counsel subsequently

requested a hearing as to why the alibi witnesses had declined to testify and

what their attorney had said to them about how they would incriminate themselves, but no hearing was held.  Petitioner ultimately was tried and convicted.

On appeal, Petitioner asserted that "the State's actions with regard to the alibi witnesses were improper" because they "infringed on [his] constitutional right to present a defense" when the witnesses refused to testify.  *Graham*, 764 N.W.2d at 347–49.  He claimed that the State violated his constitutional right to present a full defense "by suggesting that two alibi witnesses could be subject to prosecution and by petitioning the district court to have independent counsel appointed to represent the two witnesses."  *Id.* at 348.

The Minnesota Supreme Court noted the potential conflict for prosecutors when confronted with information that a testifying witness may incriminate herself by giving perjured testimony.  On the one hand, the United States Constitution provides the defendant with a fundamental constitutional right to present a full defense, including the right to call witness.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . ."); *Webb v. Texas*, 409 U.S. 95, 98 (1972) (*per curiam*).  On the other hand, a prosecutor, said the court, should protect a witness' Fifth Amendment right against self-incrimination:  "A defendant's constitutional right to present a defense is not an unfettered right, it does not permit a defendant to compel a prospective witness to waive her Fifth

Amendment privilege against self-incrimination." *Graham*, 764 N.W.2d at 349.

In dealing with this tension between the defendant's Sixth Amendment right to present a full defense and a witness's Fifth Amendment privilege to not self-incriminate, the court said that government actors must take care not to substantially interfere with a witness' free and voluntary choice to testify:

> In determining whether the State has infringed on a defendant's constitutional right to present a defense by warning a witness of possible self-incrimination, federal courts have held that "the dispositive question in each case is whether the government actor's interference with a witness's decision to testify was 'substantial.'" *United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005) (citing *United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983)).  Federal courts prohibit the State from giving warnings of self-incrimination that "exert such distress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify."  *Commonwealth v. Jennings*, 225 Pa. Super. 489, 311 A.2d 720, 722 (1973) (citing *Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (internal quotation marks omitted).

*Id*. at 349–50.

In this case, said the court, the way in which the prosecutor allegedly interfered with the witness' decision to testify was by requesting that independent counsel be appointed to advise the witness of possible self-incrimination from false testimony.  The court noted that it had not, "up to now, articulated a standard to govern State treatment of prospective defense witnesses under these particular circumstances."  *Id*. at 350.  So the court chose to apply a two-part test:

> First, the State must be able to point to facts that support a reasonable and substantial belief that the witness will offer false or self-incriminating testimony.  Second, once the State has

> demonstrated a reasonable basis for believing a witness' testimony
> may be false or self-incriminating, the warnings of self-incrimination
> must be given in an appropriate manner so as not to preclude a
> witness' free and voluntary choice to testify by exerting undue
> distress on the witness.

*Id.*

The court concluded, based on the application of the two-part test, that the State acted properly in this case. First, the State pointed to facts supporting a reasonable and substantial belief that the two witnesses would testify falsely, including the following: (1) the prior history of Petitioner's attempt to get his girlfriend to lie for him to get an acquittal on terroristic-threats charges; (2) there was a no-contact order in place at the time of the stated alibi; (3) the two witnesses did not come forward with an alibi for Petitioner until nine months after Petitioner was charged; and (4) the co-defendant had implicated Petitioner in the murder when he entered his guilty plea.

Second, the court concluded that after the State demonstrated the substantial basis for the belief that the witnesses' testimony may be false or self-incriminating, the warnings of self-incrimination were given in an appropriate manner so as not to preclude the witnesses' free and voluntary choice to testify:

> The record as a whole, however, leads us to the conclusion that the
> State acted properly. The State raised the issue of self-incrimination
> with the district court, the court then made a decision based on the
> evidence to appoint independent counsel to advise the witnesses.
> The witnesses were provided as much time with counsel as they
> required to consider their options, and neither the court nor the State
> talked to the witnesses outside the presence of their independent
> counsel. The phrase "impending liability" was used only once by the
> State, and not in the presence of the witnesses or their appointed

> counsel.  Given the appointment of independent counsel and the
> lack of direct contact between the State and the witnesses, we
> conclude that the witnesses were able to make a free and voluntary
> decision.

*Id.* at 350–51.  Thus, the Minnesota Supreme Court concluded that the State did

not commit constitutional error when it requested the appointment of counsel to

advise the alibi witnesses.

## DISCUSSION

Petitioner claims that his conviction violated his right, guaranteed by the

Sixth Amendment of the U.S. Constitution, to present a defense.  He contends

that the alibi witnesses had no Fifth Amendment right to refuse testimony based

solely on the fear of prosecution for false testimony.  The Minnesota Supreme

Court, he argues, incorrectly created such a Fifth Amendment right and, in so

doing, unconstitutionally denied Petitioner's Sixth Amendment right to present a

defense.

## I.    Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), prescribes

the standards that govern this Court's substantive review of Petitioner's habeas

corpus claims.  The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides

that:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or

> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the U.S. Supreme Court

discussed the meaning of this statute, and how it should be applied by the

federal district courts.  The Supreme Court recognized that –

> a state-court decision can be 'contrary to' this Court's clearly
> established precedent in two ways.  First, a state-court decision is
> contrary to this Court's precedent if the state court arrives at a
> conclusion opposite to that reached by this Court on a question of
> law.  Second, a state-court decision is also contrary to this Court's
> precedent if the state court confronts facts that are materially
> indistinguishable from a relevant Supreme Court precedent and
> arrives at a result opposite to ours.

*Id.* at 405.

> Under the 'unreasonable application' clause, a federal habeas court
> may grant the writ if the state court identifies the correct governing
> legal principle from [the Supreme] Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's
> case.

*Id.* at 413.

> The Court also explained that –
>
> A federal habeas court making the 'unreasonable application' inquiry
> should ask whether the state court's application of clearly
> established federal law was *objectively unreasonable* . . . . [A]
> federal habeas court may not issue the writ simply because that
> court concludes in its independent judgment that the relevant state-
> court decision applied clearly established federal law erroneously or
> incorrectly.  Rather, that application must also be unreasonable.

*Id.* at 409, 411 (emphasis added).  As the Eighth Circuit has stated, "[a] state court decision may be incorrect, yet still not unreasonable, and we will grant relief only if the state court decision is both incorrect *and* unreasonable."  *Cole v. Roper*, 623 F.3d 1183, 1187 (8th Cir. 2010).

A writ of habeas corpus may also be available where the state court's resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In other words, habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the state court evidentiary record.  When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence."  *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000); *see also* 28 U.S.C. § 2254(e)(1).

A federal district court is not allowed to conduct its own *de novo* review of a state prisoner's constitutional claims.  Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts.  Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court of the United States.

## II.     Applicable Federal Law

Pursuant to the AEDPA, this Court must first determine the applicable

constitutional law, as determined by the Supreme Court, governing the

defendant's right to present a defense.  The Sixth Amendment, applicable to the

states through the Fourteenth Amendment, provides in relevant part that, "In all

criminal prosecutions, the accused shall enjoy the right . . . to have compulsory

process for obtaining witnesses in his favor[.]"  In 1967, in *Washington v. Texas*,

388 U.S. 14 (1967) the court described this constitutional protection in terms of

the right to present a defense:

> The right to offer the testimony of witnesses, and to compel their
> attendance, if necessary, is in plain terms the right to present a
> defense, the right to present the defendant's version of the facts as
> well as the prosecution's to the jury so it may decide where the truth
> lies.  Just as an accused has the right to confront the prosecution's
> witnesses for the purpose of challenging their testimony, he has the
> right to present his own witnesses to establish a defense.  This right
> is a fundamental element of due process of law.

*Id.* at 19.

In *Washington*, the Supreme Court struck down two Texas statutes that

provided that persons charged or convicted as co-participants in the same crime

could not testify for one another.  These statutes amounted to "arbitrary rules that

prevent whole categories of defense witnesses from testifying on the basis of a

priori categories that presume them unworthy of belief."  *Id.* at 22.  The Court

concluded that the State could not arbitrarily deny the defendant "the right to put

on the stand a witness who was physically and mentally capable of testifying to

events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23. But the Court was careful to say that it was not abrogating the witness' privilege against self-incrimination:

> Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination or the lawyer-client or husband-wife privileges, which are based on entirely different considerations from those underlying the common-law disqualifications for interest. Nor do we deal in this case with nonarbitrary state rules that disqualify as witnesses persons who, because of mental infirmity or infancy, are incapable of observing events or testifying about them.

*Id.*

Then, in *Webb v. Texas*, 409 U.S. 95 (1972), the Supreme Court held that a defendant was deprived of his Sixth Amendment compulsory-process right when a trial judge singled out a defense witness for a lengthy admonition on the dangers of perjury. The witness, who had a prior criminal record and was then serving a prison sentence, was admonished by the trial judge that if he took the witness stand and lied under oath, "the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the likelihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you already got, so that is the matter you have got to make up your mind on." *Id.* at 96. The Court found that the "unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98. The witness did in fact refuse to testify, and the Supreme Court concluded that the

judge's threatening remarks effectively drove the defense witness off the stand and thus deprived the defendant of his constitutional rights.

There was no record made in *Webb* that the witness was going to give false testimony or, indeed, what the witness was going to testify about at all.  It appears that the trial judge simply took it upon himself to warn the witness about the penalties that would befall him if he perjured himself because of his status as a convicted criminal who was serving a prison sentence.  Since 1972, *Webb* has not been interpreted by the federal courts as holding that the Sixth Amendment is implicated every time a prosecutor or trial judge offers advice to a witness regarding the penalties of perjury.  *See, e.g.*, *United States v. Davis*, 974 F.2d 182, 187 (D.C. Cir. 1992) ("Indeed, there are circumstances when warnings about the possibility and consequences of a perjury charge are warranted—even prudent"); *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982) ("It is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely.").

Instead, the standard that has developed to determine whether a trial court or prosecutor has infringed on a defendant's Sixth amendment right to present a defense by warning a witness about possible self-incrimination "is whether the government's actor's interference with a witness's decision not to testify was 'substantial.'"  *United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005) (quotation omitted).  Applying *Webb*, the question that must be answered is

whether the warnings about self-incrimination "exert such distress on the witness'

mind as to preclude him from making a free and voluntary choice whether or not

to testify."  409 U.S. at 98.  As the Eighth Circuit has noted, the inquiry into

whether the interference is substantial is "extremely fact specific."  *United States*

*v. True*, 179 F.3d 1087, 1090 (8th Cir. 1999).  The Ninth Circuit described the

relevant inquiry this way:

> Among the factors courts consider in determining the coercive
> impact of perjury warnings are the manner in which the prosecutor or
> judge raises the issue, the language of the warnings, and the
> prosecutor's or judge's basis in the record for believing the witness
> might lie.  *See, e.g.*, *Davis*, 974 F.2d at 187-99; *United States v.
> Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988) (*en banc*).  At least in the
> case of trial judges, we also scrutinize whether the warning indicates
> an expectation of perjury.  *See Harlin*, 539 F.2d at 681.  Where,
> under the totality of the circumstances, "'the substance of what the
> prosecutor communicates to the witness is a threat over and above
> what the record indicates is necessary, and appropriate, the
> inference that the prosecutor sought to coerce a witness into silence
> is strong.'"  *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995)
> (quoting *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir.
> 1991)).

*United States v. Vavages*, 151 F.3d 1185, 1190 (9th Cir. 1998).

The other strain of constitutional law that comes into play here is the

subpoenaed witness' Fifth Amendment right not to self-incriminate.  The Fifth

Amendment provides that, "No person . . . shall be compelled in any criminal

case to be a witness against himself."  The Fifth Amendment privilege to refuse

self-incriminating testimony is of course one of the fundamental constitutional

liberties and it "must be accorded liberal construction in favor of the right it was

intended to secure." *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  The

Fifth Amendment privilege, however, is not a free pass to the witness who simply

does not want to testify for whatever reason.  Its protection is "confined to

instances where the witness has reasonable cause to apprehend danger from a

direct answer."  *Id.*  And it is for the court, not the witness, to say whether silence

is justified.  *Id.*  This can impose a difficult duty on the trial court because too

much disclosure about the reason why the witness fears self-incrimination could

incriminate the witness:

> If the witness, upon interposing his claim, were required to prove the
> hazard in the sense in which a claim is usually required to be
> established in court, he would be compelled to surrender the very
> protection which the privilege is designed to guarantee.  To sustain
> the privilege, it need only be evidence from the implications of the
> question in the setting in which it is asked, that a responsive answer
> to the question or an explanation of why it cannot be answered
> might be dangerous because injurious disclosure could result.  The
> trial judge in appraising the claim must be governed as much by his
> personal perception of the peculiarities of the case as by the facts
> actually in evidence.

*Id.* at 486–87 (quotations omitted).

The Fifth Amendment privilege against self-incrimination does not protect a

witness from a perjury charge for giving false testimony after being sworn in.  The

substantial and real hazard covered by the Fifth Amendment is the risk that the

compelled testimony will expose the witness to criminal charges for conduct the

witness engaged in before taking the oath.  The Supreme Court has explained:

> We hold here that in our jurisprudence there likewise is no doctrine
> of "anticipatory perjury."  In the criminal law, both a culpable *mens
> rea* and a criminal *actus reus* are generally required for an offense to

> occur.  Similarly, a future intention to commit perjury or to make false
> statements if granted immunity because of a claim of compulsory
> self-incrimination is not by itself sufficient to create a "substantial and
> 'real'" hazard that permits invocation of the Fifth Amendment.  *Brown
> v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); *Rogers
> v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951).

*United States v. Apfelbaum*, 445 U.S. 115, 131 (1980).  Thus, a witness's fear

that she will be prosecuted for perjury if she gave truthful testimony is not, by

itself, a sufficient basis for invoking the Fifth Amendment privilege.  *Vavages*, 151

F.3d at 1187–88.  But fear of perjury prosecution can typically form a valid basis

for invoking the Fifth Amendment where the risk of prosecution arises out of the

witness' past testimony or conduct.  *See United States v. Whittington*, 783 F.2d

1210, 1218 (5th Cir. 1986).

## III.   Analysis

This Court concludes that the Minnesota Supreme Court did not render a

decision in Petitioner's case that "was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme

Court of the United States," 28 U.S.C. § 2254(d)(1), when concluding that the

State's actions with regard to the alibi witnesses did not violate Petitioner's Sixth

Amendment right to present a defense.  28 U.S.C. § 2254(d)(1).  The court

started its analysis of this constitutional question by referring to the fact that

"[b]oth the United States Constitution and the Minnesota Constitution provide a

defendant with a fundamental constitutional right to present a full defense," and

by stating the current state of the law in that "Federal Courts prohibit the State

from giving warnings of self-incrimination that exert such distress on the witness'
mind as to preclude him from making a free and voluntary choice whether or not
to testify[.]" *Graham*, 764 N.W.2d at 349 (citing *Webb*, 409 U.S. at 98).

The court then applied this principle to the circumstances before it in
Petitioner's case where the prosecutor (1) raised a concern before the trial court
about false testimony by the alibi witnesses; (2) warned that there was an active
on-going investigation about whether prior statements by the alibi witnesses
constituted the crime of aiding an offender; and (3) asked for appointment of
independent counsel to advise the witnesses.  Before sustaining the appointment
of counsel in such circumstances, the Minnesota Supreme Court required that
the State point to facts that supported a reasonable and substantial belief that the
witness would offer false or self-incriminating testimony.  Here, the court found
that there were ample facts to support such a belief: (1) Petitioner had a history
of trying to get his girlfriend, one of the alibi witnesses, to lie for him to the
authorities to avoid criminal conviction; (2) Petitioner was under a no-contact
order with the girlfriend at the time of the murders; (3) neither alibi witness came
forward with the alibi until nine months after Petitioner was charged; and
(4) Petitioner's co-defendant had implicated Petitioner in the murder when he
pled guilty.  Further, additional support existed based on the fact that Petitioner
maintained from the time he was charged with murder that he acted in self-
defense.  In light of all of the facts highlighted by the Minnesota Supreme Court,

and the current state of the law, there is no clearly established federal law that would bar a perjury warning in these circumstances.  *See Davis*, 974 F.2d at 187.

The Minnesota Supreme Court also examined the manner in which the State raised the self-incrimination issue to determine whether the witnesses made a free and voluntary choice to testify.  In this case, the prosecutor never had any direct contact with the alibi witnesses and had not made threats of perjury prosecution or otherwise tried to coerce the witnesses against testifying. Rather, as the Minnesota Supreme Court noted, the prosecutor raised the potential self-incrimination issue with the trial court, presented the basis for the belief that the alibi was false, and disclosed the potential serious harm that could befall the witnesses from having already given—in the State's view—false statements that aided the crime.  It was the trial court, not the prosecutor, who decided, on the basis of this showing, to appoint independent counsel to advise the witnesses.  The witnesses were provided ample time with the counsel to decide what to do, and neither the trial judge nor the prosecutor talked to the witnesses outside the presence of the criminal defense lawyer who advised the witnesses.

In reaching the conclusion that the prosecutor's actions in this case did not eviscerate the free and voluntary choice of the putative alibi witnesses to testify, the Minnesota Supreme Court did not unreasonably apply established federal law protecting the Petitioner's Sixth Amendment right to present a defense.  Of

course, even if it was this Court's conclusion that the Minnesota Supreme Court had incorrectly or erroneously applied the federal law—and this is not this Court's conclusion—this would not be enough to grant habeas relief under AEDPA.  Only an "unreasonable" application warrants habeas relief.  *Williams*, 529 U.S. at 410–11.  No such relief is warranted here.

But this does not end the matter.  In his habeas Petition, Petitioner presents a related constitutional issue that was not directly addressed by the Minnesota Supreme Court.  Namely, he focuses his attack not on the propriety of the warnings given to the alibi witnesses by the prosecutor or on the appointment of independent counsel by the trial court to advise them, but on "their subsequent refusal to testify at all on Fifth Amendment grounds."  (Doc. No. 13, Pet'r's Reply Br. 8.)  Even though a witness called by the defense might in some circumstance have the right to claim the self-incrimination privilege and thus thwart the presentation of the defense, argues the Petitioner, this was not the case here. Petitioner asserts that his alibi witnesses arguably never qualified for the self-incrimination privilege because the privilege does not protect a witness from perjuring herself.  Thus, Petitioner argues in his federal habeas that his Sixth Amendment right to a defense was violated by the trial court's improper allowance of a blanket invocation of the Fifth Amendment privilege by the alibi witnesses.

Although the Minnesota Supreme Court referred in general terms to the

witnesses' right to not self-incriminate, it did not directly confront the application of the self-incrimination privilege here by these witnesses on Petitioner's Sixth Amendment rights; it dealt only with the issue of the propriety of the appointment of counsel to advise the witnesses about what to do.  It appears that the Minnesota Supreme Court did not address this issue because it was not clearly presented to the court on Petitioner's direct appeal.  The issue raised by Petitioner's appeal was:

> 1.  Did Ms. Graham [the Prosecutor] commit prejudicial misconduct, and the district court abuse its discretion in its rulings, sufficiently to warrant a new trial for Appellant?
>
> Ms. Graham's [the Prosecutor's] motion to appoint counsel for Mr. Graham's [Petitioner's] alibi witnesses, whom she threatened with prosecution, was granted by the district court, which also sustained repeated objections to proper defense impeachment, and overruled defense objections to Ms. Graham's improper closing arguments.

(Doc. No. 11, App. at 10, Pet'r's Br. on Direct Appeal 4.)  In the body of the direct appeal brief, Petitioner did say, at one point, that the alibi witnesses "arguably did not even have the right to invoke the Fifth Amendment, nor to receive court-appointed counsel" but the argument was not developed any further.  (Doc. No. 11, App. at 40, Pet'r's Br. on Direct Appeal 46.)

A claim for habeas corpus relief will not be considered in federal court unless the Petitioner has exhausted his state court remedies by fairly presenting his federal claim in state court "thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  Fair presentment requires

that prisoner to "refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." *Cox v. Burger*, 398 F.3d 1025, 1031 (8th Cir. 2005) (internal quotation marks omitted). "Presenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Id.* (internal marks omitted). Further, a federal claim has not been fairly presented to a state court "if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin*, 541 U.S. at 32.

Further, a constitutional claim is procedurally defaulted if the state prisoner has failed to exhaust his state court remedies by not fairly presenting the claim to the state court and when the state court will no longer review it because an independent and adequate state procedural rule precludes further litigation of the claim. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Here there would be such a bar because the Minnesota Supreme Court would not grant review of a claim that was not presented on direct appeal. *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976). Thus, federal habeas review could be barred unless Petitioner demonstrates cause and prejudice for the default in state court or that the failure to consider the claims will result in a fundamental miscarriage of justice. *Id*.

This Court concludes that this procedural bar should not be applied to

Petitioner's claim.  For one thing, the Respondent has not raised a procedural-default defense, and when the state has failed "to advance a procedural default argument, such argument is waived."  *Jones v. Norman*, 633 F.3d 661, 666 (8th Cir. 2011) (quoting *Robinson v. Crest*, 278 F.3d 862, 865 (8th Cir. 2002)).  Although this Court has the discretion to raise the procedural-default issue *sua sponte*, this is not the type of case where such discretion should be exercised.  There is no indication that the State's failure to raise the procedural-default defense in this case was an "obviously inadvertent omission" or "an obvious computation error."  *Id*.  Moreover, "judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated."  *Barrett v. Aceveto*, 169 F.3d 1155, 1162 (8th Cir. 1999).

Turning to the merits, this Court concludes that the State did not violate clearly established Supreme Court law by upholding the alibi witnesses' invocation of the Fifth Amendment privilege against compulsory self-incrimination.   The Supreme Court has articulated the standard that must be met in reviewing the propriety of an invocation of the Fifth Amendment as follows:

> The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination.

*Apfelbaum*, 445 U.S. at 128 (quotations omitted).

In this case, the trial court hearing record shows that the alibi witnesses

were confronted by "substantial and real" hazards of incrimination.  From the outset, the prosecutor told the trial court that the witnesses were in jeopardy of criminal prosecution for aiding an offender in violation of Minn. Stat. § 609.495 because they had already given statements to an investigator that were false. The prosecutor backed this up by showing to the court the basis for the conclusion that the statements were in fact false and explaining to the court that if the witnesses were charged and convicted of this violation of Minn. Stat. § 609.495 "the sentence that crime would carry is half what defendant is looking at" – in other words a very, very long sentence measured against the first-degree-murder penalty.  *Graham*, 764 N.W.2d 340.  Any competent criminal-defense attorney advising these two witnesses about whether to invoke Fifth Amendment protection would counsel her client that testifying at trial under oath about the same subject matter as the allegedly false statements that had already aided the offender would place the witness at greater risk.  If the witness disowned the alibi at trial, it would confirm the falsity of the statements already made and adopted by the witness.  But if the witness stuck to the alibi story, it would likely increase the likelihood of prosecution for the offense already allegedly committed and would aggravate the problem with a perjury charge. Given these circumstances, it was appropriate and wise for the trial judge to appoint counsel for the witnesses to provide legal advice about whether the Fifth Amendment should be invoked.

Petitioner criticizes the trial court for not requiring the appointed counsel to place on the record how the witnesses would incriminate themselves at trial and "how he had advised the clients how they would incriminate themselves should they testify." (Tr. 306–07.) But the appointed counsel explained that his conversations with his clients were privileged—as they certainly were—and he would not breach the privilege. Given all of the background information that was already on the record about the nature of the problem facing the witnesses about whether or not to testify and thus risk self-incrimination, the decision by the trial court to not compel the witnesses, or their attorney, to explain just how the alibi testimony would incriminate the witnesses was not a violation of the Petitioner's constitutional right to present a defense. The trial judge had a sufficient basis, on the record already made, to sustain the witnesses' invocation of the Fifth Amendment privilege and going further would have risked the disclosure of the very self-incrimination information that the Fifth Amendment protects from disclosure. *See Hoffman*, 341 U.S. at 486 (stating that in applying the Fifth Amendment protection, the court must take care not to compel the witness "to surrender the very protection which the privilege is designed to guarantee"). Thus, the trial court did not, in this circumstance, render a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court when deciding that the two putative alibi witnesses could invoke their Fifth Amendment right to avoid self-

incrimination and not testify.

## RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Petitioner's Petition Under 28 USC § 2254 for Writ of Habeas

Corpus by a Person in State Custody (Doc. No. 1), be **DENIED**; and

2.      This action be **DISMISSED WITH PREJUDICE**.


Date:  May 19, 2011


                                        *s/ Jeffrey J. Keyes*_____
                                        JEFFREY J. KEYES
                                        United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**June 2, 2011**, a writing which specifically identifies those portions of this Report
to which objections are made and the basis of those objections.  Failure to
comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  All briefs filed
under this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.